ALFRED D. MULLETT *vs.* EARL C. PELTIER & others.[1]

No. 89-P-970.

Berkshire. December 5, 1990. - October 7, 1991.

Present: ARMSTRONG, SMITH, & PORADA, JJ.

*Option. Contract*, Option, Sale of real estate. *Landlord and Tenant*, Option to purchase, Termination of lease.

A plaintiff seeking specific performance of an option agreement to convey real estate did not demonstrate that he properly exercised the option [448-449]; nor was he entitled to refund of any monies paid as rent for the property under a lease [449-450]; nor was he entitled to further reimbursements from the proceeds of a policy of insurance paid after a fire destroyed the premises [450].

CIVIL ACTION commenced in the Superior Court Department on September 20, 1985.

The case was heard by *Charles R. Alberti*, J.

*Stephen Pagnotta* for the plaintiff.

*Robert I. Manuel* (*John P. Green* with him) for the defendants.

ARMSTRONG, J. Mullett appeals from a judgment that denied his request for specific performance of an option agreement to convey real estate, the building on which was destroyed by fire. His contention is that the application of the fire insurance proceeds discharged his payment obligations under the agreement, entitling him to a conveyance.

The facts on which the judgment was based were the following, all as agreed to by Mullett in the statement of facts he presented to the court. In November, 1981, the Peltiers, owners of a restaurant or tavern in Adams known as the "Glenview," entered into a lease agreement with Mullett, with an option in the latter to purchase the property by pay-

---

[1]Edythe L. Peltier and Adams Cooperative Bank..

ing off the Peltiers' mortgage. The terms of the arrangement were these. The parties were to apply for a transfer of the Peltiers' alcoholic beverages license to Mullett. If this were not approved, the entire agreement would be void; if it were approved, Mullett would pay the Peltiers $10,000, from which various fees would be deducted. The Peltiers would sell specified equipment and furnishings in Glenview to Mullett for $5,000. On the date of approval of the license transfer, an inventory would be made of liquors and food on hand, for which Mullett would pay the Peltiers their actual cost. The lease of the real estate was to be for three years, with options in Mullett to renew for five additional three-year terms. Mullett was to pay rent of $200 per month to the Peltiers plus $466.07 per month to the Adams Cooperative Bank, which was the monthly payment required on a twenty-year, $50,000 mortgage the Peltiers had given the bank in 1978. At any time during the lease term or a renewal term, Mullett could purchase the property by paying the bank the balance then due on the mortgage; this could happen merely by payment of the monthly rent if Mullett should exercise the fifth renewal, during which period the final installment on the mortgage would fall due. (An executed deed was held in escrow by the bank.) Mullett was responsible for the payment of all municipal taxes and assessments, insurance premiums, and upkeep and ordinary repairs. The Peltiers were to be responsible for restoring the premises in the event of casualty.

The alcoholic beverages license transfer was approved. Mullett paid the Peltiers the $10,000, and the first lease term commenced in December, 1981. On December 25, 1984, shortly into the first renewal term of the lease, the Glenview was destroyed by fire. On that date Mullett was in arrears on real estate taxes (he escrowed taxes and claims not to have been notified of the deficiency) but was current in his rent and other obligations. He paid the December rent but then ceased all payments. On March 28, 1985, Mullett received a notice of default from the Peltiers for deficiencies in "rent, mortgage payments, and real estate taxes." The lease terms

provided that the lease agreement would be null and void if defaults were not rectified within thirty days of notice. The day after receiving the notice, Mullett paid the arrearages in mortgage payments to the bank, but he did not bring current either the real estate taxes or the monthly $200 payments to the Peltiers.

The insurance policy listed three loss payees: the bank, the Peltiers, and Mullett. The claim chronology was as follows: On February 1, 1985, the bank filed a proof-of-loss statement for $42,693.24, the amount then due on the mortgage. On March 28, 1985, the day he received the default notice, Mullett filed a proof-of-loss statement claiming $17,661.00 for equipment, furnishings, inventory and cash, and $200,000 for the building.[2] On April 12, 1985, the bank received from the insurer a check for $40,560.27, representing the bank's proved loss, $42,693.24, less $2,132.97 paid by the insurer to the town to discharge its lien for back taxes. The check was made payable to the bank and the Peltiers jointly. On April 16, Mullett's attorney, responding to the notice of default, wrote to the Peltiers asserting that Mullett, having brought the mortgage payments up to date, was not then in default[3]; and on April 17 the bank wrote to the Peltiers informing them of the receipt of the check for $40,560.07 and asking that they come in and endorse it promptly since it was not earning interest whereas the mortgage interest was still running. The bank's letter pointed out that a small balance would remain due on the mortgage after application of the insurance proceeds,[4] and it sent a copy ol the letter to Mul-

---

[2]The record makes no mention of a proof-of-loss statement by the Peltiers.

[3]The gist of the letter was that Mullett had brought current his payments to the bank; that he was under no obligation to continue the $200 payments to the Peltiers in view of the destruction of the Glenview; and that he had not been notified by the town of any deficiency in real estate taxes.

[4]The deficiency would exist because the amount of insurance proceeds diverted from the bank to the payment of real estate taxes ($2,132.97) exceeded the payment Mullett had made to the bank ($1,390.94) to bring the mortgage payments current. (The latter figure included late charges and interest.)

lett's attorney, indicating that on payment of that balance it would turn the deed over to Mullett. Mullett, however, made no further payments, and, because the Peltiers declined to endorse the insurance proceeds check until October 8, 1985, when they did so by virtue of a court order, the balance due on the mortgage had grown by $4,705.28. On March 25, 1986, the insurer issued a check for $30,328.59, payable to the Peltiers and Mullett, to cover all loses including personal property.[5] This was endorsed on June 6, 1986, and the mortgage balance was paid off the same day. The Glenview lot remains vacant, and the balance of the insurance proceeds, escrowed with the clerk, stands at roughly $27,000.

Mullett contends that he is entitled to the deed to the Glenview property and the balance of the insurance proceeds, his theory being that, on payoff of the mortgage balance, he had, by the term of the lease, purchased the property. Alternatively, should that theory be rejected, he claims to be entitled to return of the payments he made to the bank (totalling $28,653.53), the $10,000 he paid for the liquor license, and a sum for improvements he claims to have made to the property —all for a total of $46,314.53.

The judge correctly rejected Mullett's claim for specific performance. The option to purchase was to be exercised by tendering the full balance due on the mortgage. The mortgage was not paid off until June 6, 1986, from the second insurance payment. The lease-purchase agreement, however, had become, by its express terms, null and void thirty days after March 28, 1985, as a result of Mullett's receipt of the notice of default coupled with his failure to rectify the defaults within the time allowed. Any necessary election by the landlords to terminate was sufficiently manifested by their answer to the complaint, filed well before the payoff of the mortgage. Contrast *Leisure Sports Inv. Corp.* v. *Riverside Enterprises, Inc.*, 7 Mass. App. Ct. 489, 491-492 (1979), where a lessee in breach was permitted to exercise an option to purchase prior to the date of termination of the lease. It is

---

[5]The insurer in addition paid $9,978.17 for demolition of the building.

not necessary to rule on Mullett's contention that his obligation to pay rent to the Peltiers was excused until they should have discharged their obligation to rebuild the Glenview;[6] he was, in any event, in default of his obligation to pay real estate taxes.

Mullett is also not entitled to return of his mortgage payments to the bank. His contention here is that, where premises under a contract of sale are destroyed by fire, the contract of sale is no longer binding on either party, and "[i]f the purchaser has advanced any part of the price, he can recover it back." *Hawkes* v. *Kehoe*, 193 Mass. 419, 425 (1907).[7] It is true that the lease-purchase agreement characterized the mortgage payments to be made by Mullett "as payments toward the purchase price of the leased property," but those payments had a dual character: they were unquestionably part of the monthly rent. They were required by the clause of the lease captioned "*Rent*," and it was clear that they were not to be refunded if Mullett should elect not to renew the lease at the end of any of the three-year terms, or if the premises should be taken by eminent domain. The $10,000 payment was not, as Mullett argues, a down pay-

---

[6]Mullett's contention is based on a theory that the duty to pay rent was dependent on the existence of the Glenview, for which he cites *Holmes Realty Trust* v. *Granite City Storage Co.*, 25 Mass. App. Ct. 272, 277-278 n. 2 (1988). That decision expressed doubt concerning the continued validity, even in a commercial context, of the ancient doctrine that, absent provision to the contrary in the lease, the covenant to pay rent was independent of the landlord's performance of his obligations. By that rule the destruction of the premises would not by itself relieve a commercial tenant of his obligation to pay rent. See *Roberts* v. *Lynn Ice Co.*, 187 Mass. 402, 405, 407-408 (1905), and cases cited; Warshaw, Massachusetts Landlord-Tenant Law, § 2.14 at 89 (1987). The Peltiers, in contrast, were clearly *not* in breach when the rent stopped, because the duty to rebuild by its nature cannot be discharged instantly; a duty to rebuild after a fire presupposes a reasonable time for clearance and construction. Moreover, the duty of the landlords to reconstruct the Glenview, which appears in the insurance clause of the agreement, was probably dependent on receipt of the insurance proceeds, which were to be held in escrow and applied to the reconstruction as the work progressed.

[7]But see *Allyn* v. *Allyn*, 154 Mass. 570, 572-573 (1891), as to contracts which, like this one, expressly contemplate the possibility of destruction by fire or other casualty.

ment on the purchase of the Glenview; it was payment for the alcoholic beverages license.

Mullett's only argument concerning the judge's allocation of the $27,000 of escrowed insurance proceeds appears to be that he is entitled to reimbursement therefrom for the entire $17,000 loss of personal property he claimed in his proof-of-loss statement. The insurer, however, paid only $10,000 on account of personal property loss. The insurer is not a party to this proceeding. No contention is made that the Peltiers were not entitled to have their personal property loss reimbursed from the available $10,000 on an equal footing with Mullett's (this is what the judge did), nor is any contention made that the deductions the judge took from Mullett's half (for rent and taxes through April, 1985) were not proper.

*Judgment affirmed.*